**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 CR 00487 |
| v. | ) | |
| | ) | |
| JAMES BARTA, GUSTAVO BUENROSTRO, | ) | Judge John J. Tharp, Jr. |
| and AMBROSIO MEDRANO, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On June 17, 2013, a jury returned a verdict finding defendants James Barta, Gustavo Buenrostro, and Ambrosio Medrano guilty of conspiracy to commit bribery, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 666(a)(2). The indictment alleged that the defendants agreed to pay a bribe to a Los Angeles County official in order to obtain a contract to provide mail-order prescription medication services to the county's hospital system though Sav-Rx, a company owned by defendant Barta. In reality, the defendants were caught in a federal sting operation; the county official did not exist, and the broker who purported to represent him was an undercover FBI agent working with a cooperating witness acquainted with defendant Medrano.

The defendants now file motions for judgment of acquittal, *see* Fed. R. Crim. P. 29, and for a new trial, *see* Fed. R. Crim. P. 33. Each defendant has adopted his co-defendants' motions insofar as they pertain to him.

**I.      Rule 29 Motions**

The defendants argue that the evidence on multiple critical elements was insufficient to convict them. After a jury's guilty verdict, a criminal defendant seeking a judgment of acquittal

under Rule 29 faces a hurdle that the Seventh Circuit has deemed "nearly insurmountable." *See*

*United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Nevertheless, it is not "wholly

insurmountable," and because the government bears the burden of proof, "the height of the

hurdle depends directly on the strength of the government's evidence." *Id*. If the evidence is

insufficient to sustain the conviction, this Court must grant a motion for judgment of acquittal.

*See id*. at 339-40.

In reviewing the defendants' Rule 29 motions, the Court will not catalog all of the

evidence presented by the government over the course of the two-week trial.[1] The defendants

were accused of agreeing to pay a $10,000 bribe to an official in the government of Los Angeles

County, California, in order to obtain a contract to provide mail-order prescription drug services

through Sav-Rx. The government's case consisted of two witnesses—the case agent, Brian

Etchell, and an undercover agent, Gabriel Casanova, known to the defendants as George Castro,

who posed as a broker of medical equipment and supplies who had a corrupt relationship with

the government official in Los Angeles. Through these witnesses, the government introduced a

number of audio and video recordings of meetings between various combinations of the

defendants, "Castro," and Michael DiFoggio, a cooperating witness, as well as records of

telephone calls and emails between and among them. A handful of meetings took place in

Chicago, and the scheme continued through a restaurant meeting in Omaha, Nebraska, on June

22, 2012, at which defendant Barta gave Castro a check for $6,500, his portion of the expected

---

[1] The government summarizes much of the evidence in its response. *See* Govt. Mem., Dkt. # 170 at 1-23. In considering a Rule 29 motion for judgment of acquittal, the evidence is viewed in the light most favorable to the government, and the verdict will be overturned only if no rational trier of fact could have found beyond a reasonable doubt that the defendants committed the essential elements of the crime. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Genova,* 333 F.3d 750, 757 (7th Cir. 2003) ("Rule 29(c) does not authorize the judge to play thirteenth juror.").

$10,000 payment. The defendants were arrested shortly thereafter. The evidence will be discussed in more detail as it pertains to the defendants' specific arguments.[2]

### A.      Failure to Prove Jurisdiction under 18 U.S.C. § 666

The defendants contend that the government failed to prove two jurisdictional prerequisites: first, that the "organization, government, or agency" targeted by the corrupt scheme received "benefits in excess of $10,000" from the federal government in one year, *see* 18 U.S.C. § 666(b), and second, that the corrupt transaction involved "anything of value of $5,000 or more," *see id.* § 666(a)(2).

### 1.      Federal Funds of $10,000 or More

The defendants stipulated at trial that "Los Angeles County" received federal funds of more than $10,000 in a year, but they argue that this fact is insufficient to establish the jurisdictional element because "[t]here is no evidence of any federal funds going to whatever purported 'agency' employed the fictitious individual who was to be the recipient of a bribe." Barta Mem., Dkt. # 142 at 1. The defendants contend that the government held the fictitious government official out to be an agent of "the Department of Health Services" or "DHS," and there is no evidence that this "agency" received any of the federal funds provided to Los Angeles County. Thus, the defendants argue, there is no proof of any relationship between the bribe recipient and the federal funds.

The government maintains that it does not matter whether it portrayed the fictitious official as an agent of Los Angeles County or as a DHS employee, asserting that "the law makes no distinction between a local government and its subdivisions." Mem., Dkt. # 170 at 31. In support of that position, the government cites a number of inapposite cases that establish only

---

[2] Citations to the trial transcripts in this opinion are to draft transcripts and may not correspond exactly to any final transcript that may be prepared in response to any party's request.

that there is no requirement to show a nexus between the federal funds received by a unit of government and the payment of the bribe to an agent of that unit. That is the proposition established by *Sabri v. United States*, 541 U.S. 600, 604-606 (2004), *United States v. Spano*, 401 F.3d 837, 839 (7th Cir. 2005), and *United States v. Grossi*, 143 F.3d 348, 351 (7th Cir. 1998), but it does not answer the question of whether there must be a nexus between the agency that receives the federal funds and the agent who participates in the bribery transaction.

The only case the government has cited that supports the proposition that there is no material distinction between a unit of local government and an agency of that local government for purposes of § 666(a) is *United States v. Trost*, 152 F.3d 715 (7th Cir. 1998). In *Trost*, the Seventh Circuit rejected the argument advanced by the Monroe County clerk that because he was not an agent of the county, but a constitutional officer of the state, the county's receipt of federal funds was an insufficient basis on which to apply § 666(a) to his embezzlement of county funds. *Id.* at 720. The opinion in the case, however, provides no analysis of the issue beyond a conclusory statement that because Monroe County is "a small county," the clerk's office "is not sufficiently independent for us to require that the federal funds come directly to the clerk's office for the statute to apply." That reasoning provides little guidance generally as to the degree of independence that must be established between an agency of local government and the local government itself, and has little relevance to the specific facts of this case, where the county that received the federal funds was not a small rural county but one comprising one of the largest metropolitan areas in the country.

The government's argument, moreover, is difficult to reconcile with the Seventh Circuit's ruling in *United States v. Abu-Shawish*, 507 F.3d 550, 555-56 (7th Cir. 2007), where it held that § 666(a) requires that the individual charged (with defrauding a federal program, in that case)

serve as an agent for the organization that received the requisite $10,000 of federal funding. None of the parties cited *Abu-Shawish*, but it squarely rejects the implication of the government's argument, which is that there is no required nexus between the government agent who is bribed and the government agency that receives federal funding. The government need not prove a nexus between the agent and the *funds*, but consistent with *Abu-Shawish*, it must prove a nexus between the agent and the *governmental unit* in question. That is also the gist of the holdings in the two cases on which the defendants principally rely. *See United States v. Phillips*, 219 F.3d 404, 412-13 (5th Cir. 2000) (reviewing evidence and concluding that it failed to establish adequate nexus between office of the parish assessor and the parish itself); *United States v. Sunia*, 643 F. Supp. 2d 51, 63 (D.D.C. 2009) (rejecting argument that the term "government" in § 666(a) encompasses "subdivisions" of government because that interpretation would render term "or agency thereof" surplusage).

The Court need not resolve definitively the legal question of whether "DHS" is a distinct unit of analysis from Los Angeles County under § 666(a), however, because the evidence presented in this case was more than sufficient to establish, beyond a reasonable doubt, that the government official in question was (conceptually, anyway) an agent of the governmental entity that received the federal funding that was introduced into evidence. Or, because the official was fictitious, the charge was conspiracy, and the jury returned a verdict of guilty on that charge, it is perhaps more accurate to say that the Court cannot conclude that no rational jury could have found beyond a reasonable doubt that the defendants agreed to bribe an agent of Los Angeles County. There was ample evidence that the official held a position with the "county" and none suggesting that he was an employee or agent of DHS. The undercover agent, as George Castro, repeatedly and from the outset referred to the purported official as someone "in the county

system" and "a high ranking official at the county system" and he suggested that this official had authority to control the decision of Los Angeles County's Board of Supervisors with respect to the contract. He explained that "in Los Angeles County right now" there was no service like Sav-Rx offered. Later, when Barta sought to confirm, "we're talking about working for the county, . . . right?," Castro confirmed, "It would be for the county. For the county system, absolutely. Right." And shortly before Barta handed Castro a check, Castro again confirmed that the payment was intended for a county official: "the county guy's an official." Moreover, defendant Medrano's prior dealings with Castro involved the same official, who purported to purchase— through Castro—the Dermafill bandages for Los Angeles County hospitals. There is more, but this sampling suffices to show that the jury's verdict was reasonable, particularly when the defendants do not point to any recording or otherwise support their bald assertion that the purported public official was exclusively an agent of "DHS" rather than Los Angeles County.[3]

### 2. Anything of Value of $5,000 or More

The defendants also argue that there was insufficient evidence that the mail-order pharmacy contract their bribe would purchase was "any business, transaction, or series of transactions . . . involving anything of value of $5,000 or more," as required by § 666(a)(2). *See United States v. Robinson*, 663 F.3d 265, 271 (7th Cir. 2011) ((explaining that "the *subject matter* of the bribe must be valued at $5,000 or more; the bribe itself need only be 'anything of value'") (emphasis in original)). Untroubled by the hobgoblin of foolish consistency, the defendants offer two reasons why the government's evidence failed to establish that the value of

---

[3] Even if there had been references connecting the official to DHS, that would not dictate a conclusion that the official was not also an agent of the county. The evidence indicated that DHS is an agency of Los Angeles County; it is reasonable to infer that its employees are county employees and, therefore, county agents. The defendants offer no basis to support the implicit assumption underlying their argument that one can be an agent of the county, or DHS, but not both.

the proposed Sav-Rx contract exceeded this threshold: (1) the evidence showed that the contract had "zero value" because Los Angeles County already had a robotic prescription-filling service; and (2) the worth of the contract was easily calculable, probably by an expert witness, based on projections of the number of prescriptions and other knowable factors, but the government failed to produce the required evidence. The defendants further argue that because the monetary value was calculable, it is not appropriate to look to the amount of the bribe as a proxy for its worth.

Taking the "zero value" argument first, the defendants latch on to the testimony of defense witness Christy Piti—the CEO of Sav-Rx—as proof that the contract was worthless to Sav-Rx because Los Angeles County did not need Sav-Rx's mail order services. But this is a conspiracy case; the relevant question is what the defendants believed and what they intended to procure with the up-front payment of $10,000, not whether the actual contract would have been worth that amount. And there is ample evidence to support the jury's conclusion that the defendants believed that the contract was worth more than $5,000. Their meeting in Omaha, at which the first check was written, occurred after the defendants became aware of the robots in use in Los Angeles. The jury reasonably could have concluded that the defendants continued to believe that the contract was valuable to them.

Solid evidence of this is that the defendants agreed to pay a $10,000 bribe and actually paid $6,500 toward that amount. "The easiest and most obvious way [to value the subject matter of the bribe] is by looking at how much someone in the market was willing to pay for the benefit and an official was willing to take to provide the benefit—the value of the bribe." *See United States v. Owens*, 697 F.3d 657, 659 (7th Cir. 2012); *United States v. Fernandes*, 272 F.3d 938, 944 (7th Cir. 2001) (adding bribes paid or promised to determine worth of actions to be taken). Use of the value of the bribe is particularly appropriate to establish the jurisdictional prerequisite

where the transaction at issue is a fictitious component of a sting operation and the charge is conspiracy; in that context, what matters is not the malapropistic "actual value" of the fictitious contract but the conspirators' agreement to attempt to secure a contract with a value in excess of $5,000. The jury was hardly irrational in concluding that their agreement to pay at least $10,000 to secure that contract proves that they believed that contract was worth at least $5,000—even if that belief were mistaken and the contract that the defendants were attempting to secure would have had no value at all.

For that reason, the defendants' contention that it is not appropriate to look to the amount of the bribe because a contract's value is knowable is off the mark. That might be true of a real contract, but this was not a real contract. The defendants' assertion that the value of this contract is "easily calculable" is dubious when they also go on to explain that its value depends on "a number of factors such as need, efficiency, volume, price per prescription, and personnel costs." Perhaps projections could have been made by an expert, based upon these inputs, or perhaps with reference to similar contracts in other jurisdictions—though presumably such an exercise would also have to account for the "black market of corruption," *see United States v. Townsend*, 630 F.3d 1003, 1012 (11th Cir. 2011), which alters traditional economic models. It is far from clear that the value of the contract the defendants discussed in this case actually was "knowable."

Even if it were, was the government obligated to invent all of the underlying data so that it could calculate a hypothetical value of the fake contract? It would have been a wasteful and cumulative exercise (and one subject to manipulation) to go through such a charade when other highly probative evidence—*i.e.,* the amount of the bribe—was available to prove that the defendants believed the value of the contract to be more than $5,000. The defendants fail to support their argument that the "market value" approach should be applied only where the "thing

of value" has a "subjective or intangible" value. *See* Medrano Mem., Dkt. # 160 at 4. It might be that the market approach is required in cases where there is a lack of alternatives, but the defendants do not cite any authority for their argument that the approach cannot be used if alternative methods do exist. The Court finds no support for the defendants' argument that the government was *required* to scientifically appraise the contract when the proxy of market value—the amount of the bribe—was easily discernible from the record.

In any event, there was ample circumstantial evidence, other than the amount of the bribe, from which a jury could conclude that, whatever the precise value of the contract, it far exceeded $5,000. For example, defendant Medrano expressed his willingness to relocate to Los Angeles—surely at an expense of more than $5,000—to oversee the contract. Moreover, the number of prescriptions that would be filled under the contract was discussed at several points, and was never thought to be less than one million per year—enough to render a contract to supply those orders more valuable than $5,000. And the defendants discussed structuring the Los Angeles deal like the one Sav-Rx had with Cook County; that was a contract worth $300,000 per month, according to one witness. The jury was therefore not without an adequate basis for concluding beyond a reasonable doubt that the contract the defendants intended to obtain corruptly was worth more than $5,000.

**B.      Venue in the Northern District of Illinois**

The defendants next contend that there was insufficient evidence from which the jury could have reasonably concluded that venue for this case was proper in the Northern District of Illinois. A criminal defendant must be tried in a district in which the charged offense was committed. Fed. R. Crim. P. 18; *United States v. Cabrales*, 524 U.S. 1, 6 (1998).  Proper venue is a requirement, but it is not an element of the criminal offense, and therefore the government must

prove venue only by a preponderance of the evidence. *United States v. Muhammad*, 502 F.3d 646, 652 (7th Cir. 2007). Ascertaining the proper venue begins with the relevant criminal statutes. *See id*. Here, the parties do not dispute that the conspiracy statute, 18 U.S.C. § 371, does not itself set forth a venue provision, and that the provision for "continuing offenses," *see* 18 U.S.C. § 3237(a), applies. *See United States v. Clark*, ---F.3d----, 2013 WL 3800351, at *2 (7th Cir. 2013). Section 3237 provides: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." In conspiracy cases, venue is proper where the agreement was formed. *United States v. Craig*, 573 F.2d 513, 517 (7th Cir. 1978). But that is not the only proper venue: "As long as one overt act in furtherance of the conspiracy was committed in a district, venue is proper there." *United States v. Molt*, 772 F.2d 366, 369-370 (7th Cir. 1985).

At trial the Court determined that venue was at issue because the propriety of venue turned on whether there was in fact a conspiracy; accordingly, the Court instructed the jury on the subject. *See Muhammad*, 502 F.3d at 656. The jury decided this factual issue by a preponderance of the evidence, *see United States v. Knox,* 540 F.3d 708, 716 (7th Cir. 2008), in favor of venue in Chicago. The defendants say that insufficient evidence supports that conclusion. Specifically, they argue that "any actual meeting of the minds did not occur before the meeting among the three co-defendants in Omaha, Nebraska on June 22, 2012," and no overt acts took place after that date, anywhere. Barta Mem., Dkt # 144 at 4; Buenrostro Mem., Dkt. # 162 at 2 (the evidence "showed that the defendants entered into this conspiratorial agreement at the meeting that took place on June 22, 2012, in Omaha, Nebraska"). The defendants contend

that before the meeting of the minds in Omaha,[4] any discussions or meetings between and among them were preliminary; Barta further contends that his participation in those preliminary conversations barely registers.

By invoking the language of contract formation, the defendants overstate what must be shown to manifest a conspiratorial "agreement." More will be said on this subject in discussing defendant Barta's argument regarding his entrapment defense, but it suffices here to say that the agreement need not be formal or express. *United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008); *United States v. Morris*, 225 F.2d 91, 92 (7th Cir. 1955). And like any other element, the agreement may be established through circumstantial evidence. *United States. v. King,* 627 F.3d 64, 652 (7th Cir. 2010) (rejecting argument that government needed direct evidence of "meeting of the minds"); *Gilmer*, 534 F.3d at 701; *United States v. Taylor*, 116 F.3d 269, 271 (7th Cir. 1997). "A conspiracy may be shown by evidence which shows that the co-conspirators embraced the criminal objective of the conspiracy, that the conspiracy continued towards its common goal, and that there were co-operative relationships." *Gilmer*, 534 F.3d at 703. Thus, the defendants miss the mark when they conclude that an "agreement" was not manifested until they all sat together in a room with money (Barta's check) on the table. The jury reasonably could have seen that meeting as another step in furtherance of a pre-existing agreement. For one thing, the amount of the bribe was not agreed to at the Omaha meeting; it had been settled beforehand.

It is possible—although certainly not required—to view the evidence in such a way that defendant Barta did not join the conspiracy until June 22, at the meeting in Omaha. But that is no

---

[4] Defendants Buenrostro and Medrano do not concede that any conspiracy began on June 22, 2012; they contend that one never existed. Barta, on the other hand, did not argue that no conspiracy existed, going only so far as to argue that the charged conspiratorial agreement "was not reached prior to June 22, 2012," Memorandum, Dkt. # 144 at 5, and that "whatever deal was consummated was consummated . . . in Omaha." Closing Argument, 6/14/12 AM Tr. at 44.

help to him. Barta need not have been part of the conspiracy when it began in order to be subject to venue in Chicago. Venue is determined with reference to *the offense*, not any particular defendant, so if any part of it was "begun, continued, or completed" here, venue was proper. *See* 18 U.S.C. § 3237; *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000). A conspiracy is an agreement, not a group. *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). It was reasonable for the jury to conclude based on the evidence at trial that Medrano and Buenrostro had agreed to bribe a public official well before June 22, and virtually all of the evidence as to their agreement pertains to meetings and communications that took place in Chicago, in the Northern District. In particular, in the ten days before the June 22 meeting, Medrano and Buenrostro made their arrangements to travel to Omaha and meet with Barta to seal the deal with a check. Their actions during just this period (putting aside their conduct for the prior six months, which the jury reasonably could have concluded established an agreement between Buenrostro and Medrano to bribe the Los Angeles County official), taken together with the evidence of their expressed desire to profit from the contract, and their knowledge that the contract would be obtained as a result of the bribe, is more than enough circumstantial evidence from which the jury could have concluded by a preponderance of the evidence that a criminal agreement was reached, and furthered, in Chicago before the Omaha meeting. Since venue attaches to the offense, not the defendants, venue would therefore be proper here as to all the defendants, even if Barta had never set foot in Chicago. *See United States v. Rodriguez–Moreno*, 526 U.S. 275, 281-82 (1999).

### C.   Insufficient Evidence of Intent

Defendant Medrano argues that there was insufficient evidence of his criminal intent. This cursory argument, which cites no authority, posits that the evidence at trial "clearly

established that Mr. Medrano did not believe than an LA County public official existed" because Medrano believed, based on inconsistencies in George Castro's story about the purported official, that "Castro was a salesman trying to procure a deal for himself and personally gain from it." Medrano does not cite any evidence of his beliefs with respect to the official, although certainly there is some evidence to support his premise that Agent Casanova was not always entirely convincing as someone with experience in the healthcare industry. But notwithstanding what the jury could have regarded as an occasionally unconvincing performance by the undercover agent, the evidence established without question that Medrano intended to use Castro to bribe a Los Angeles County official. The jury heard evidence that Medrano paid a bribe to that official, through Castro, in connection with the Dermafill deal, which directly refutes his contention that he thought Castro was deceiving the defendants about the official. Had that been the case, it is inconceivable that Medrano would have initiated the call to DiFoggio on November 15, 2011, in which he raised the prospect of a deal involving Sav-Rx and Los Angeles County. At the December 15 meeting, when DiFoggio stated that to obtain the contract, both Castro and the official required 10%, Medrano stated his willingness to "try" to obtain the contract by giving "a commission" to Castro "and the other guy." Far from voicing any suspicions about Castro, Medrano vouched for Castro to Barta and Buenrostro as having been "very, very helpful and instrumental" in arranging the Dermafill sale. Medrano also discussed opening a business with Buenrostro through which the corrupt payments could be funneled.

Medrano fails to engage with this or any other evidence from which a jury could reasonably infer that he intended to pay money not just to Castro but to a government official. The jury, rationally and not surprisingly, did not accept the argument that, despite this evidence, Medrano did not believe that the Los Angeles County official existed. When DiFoggio told

Medrano on December 21 that Castro and the official were interested, and Medrano said that was "the best Christmas present" he could imagine, the jury was entitled to take him at his word.

### D. Insufficient Evidence to Rebut Entrapment

Defendant Barta moves for judgment of acquittal based upon the government's failure to overcome his entrapment defense. Barta, a successful self-made businessman with no prior criminal background, contends that he is the prototypical innocent member of society whom the entrapment defense is meant to protect from being drawn into crime by the government. Based on his lack of predisposition (conceded, he says, by the government), he urges that any inducement whatsoever by the government was sufficient to entrap him, so the government's "relentless pursuit" requires his acquittal as a matter of law. In advancing these arguments, however, Barta overstates both the law and the reasonable inferences to be drawn from the evidence presented at trial.

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Matthews v. United States*, 485 U.S. 58, 63 (1988). Predisposition is the "principal element," and it is meant to distinguish between the "unwary innocent" and the "unwary criminal" when presented with an opportunity to commit a crime. *See id.* (citations omitted). Once a defendant has proffered sufficient evidence as to both elements of entrapment to warrant a jury instruction, the burden shifts to the government to prove beyond a reasonable doubt that defendant was *not* entrapped—*i.e.*, that he was predisposed or was not induced. *See United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011).

At trial, Barta sought an entrapment instruction. The government withdrew its initial objection to an entrapment instruction as to Barta, and the Court agreed to instruct the jury on his

defense. Before the jury was instructed, the government signaled that it did not intend to dispute the element of predisposition, and indeed, it argued only that Barta was not induced by the government to enter the corrupt conspiracy.[5] Therefore the focus here is on whether the government adduced sufficient proof that its agents did not induce Barta to join the conspiracy.

Inducement is "the sort of thing that might entice an otherwise law-abiding person" to commit a crime. *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). "Inducement can occur through a variety of methods, such as 'by grave threats, by fraud (the police might persuade [a defendant] that the act they want him to commit is not criminal), or, in the usual case in which entrapment is pleaded, by extraordinary promises—the sorts of promises that would blind the ordinary person to his legal duties.'" *United States v. Plowman*, 700 F.3d 1052, 1057-

---

[5] The Court, and Barta, took the government's deliberate decision not to even argue predisposition to be a concession that its evidence did not establish predisposition beyond a reasonable doubt. In its response to Barta's motion, however, the government now says that it simply "focused on inducement" although "the evidence also established that Barta was predisposed to commit bribery." Mem., Dkt. # 170 at 38 n.5. The Court deems this argument waived. At a jury instruction conference, the government stated that predisposition "is not an issue in this case at all, it's not something that the government will be arguing at all." 6/13/13 Morning Tr. 14-15. The Court asked if the government was "conceding" that Barta was not predisposed, and the government responded: "We will not be making any argument that he was predisposed." *Id*. at 15. In discussing the substance of the entrapment instruction, the government objected to the inclusion of factor 8 in Seventh Circuit pattern instruction 6.05 on the ground that the factor is relevant only to predisposition, not to inducement, and as such should have been redacted as irrelevant. *Id*. at 16-17 and 72. Later, in ruling on the contours of the entrapment instruction, the Court stated "the government is not contesting lack of predisposition," and drew no correction. *Id*. at 72. During closing argument, the government told the jury that it would use "the second way" to prove that Barta was not entrapped; that is by showing that "law enforcement officers or their agents did not persuade or otherwise induce defendant Barta." Closing Tr. 85-86. The government therefore disclaimed intent to disprove entrapment "the first way," namely by showing predisposition. And when Barta's attorney stated during closing argument that the jury "heard the government concede . . . that Jim Barta was not predisposed to engage in this offense," he drew no objection, nor did the government state during rebuttal that it had not conceded lack of predisposition but was merely choosing to focus on lack of inducement. Under these circumstances, the Court will not permit the government to backtrack and defend the jury's verdict on the basis that its evidence proved predisposition, even if the concession was unwarranted.

58 (7th Cir. 2012) (quoting *Evans*, 924 F.2d at 717). "Inducement" can be shown without establishing that the defendant acted out of duress or was coerced: "While coercion is sufficient to establish inducement, it is not necessary." *See United States v. Pillado*, 656 F.3d 754, 764 (7th Cir. 2011) (entrapment defense not defeated where defendant "could have walked away" and was not "forced" to participate).

The Seventh Circuit has been clear that there is no across-the-board requirement that a defendant show "extraordinary inducement." *Id*. at 765-66. However, that does not mean that the burden is uniform in every case. When there is evidence of predisposition, the defendant must show greater inducement than that which occurs in a run-of-the-mill sting operation; the more predisposed the defendant, the more extraordinary the inducement must be to entitle him to an entrapment defense. *Pillado*, 656 F.3d at 765-66; *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994) (*en banc*).

Barta takes this proposition—that a predisposed person must show a more "extraordinary" type or degree of inducement—and flips it around to argue that a non-predisposed person just has to show *any* inducement. He contends that, absent predisposition, any "affirmative act" by the government is sufficient to be "inducement" and therefore, entrapment. Barta Mem., Dkt # 157, at 4.

It is certainly not the case that the government did nothing at all here. If Barta were correct that any "affirmative act" by the government constitutes inducement if the defendant is not already predisposed to commit the crime, then as a matter of law, his defense would prevail. But in arguing that any affirmative act suffices to constitute "inducement" in the absence of predisposition, Barta overstates the law in this Circuit by conflating the predisposition and inducement elements of the entrapment defense. Entrapment has two elements—albeit

overlapping ones—always. To say that *any* act by the government is inducement is to contradict the long line of cases stating that soliciting a crime, or launching an ordinary sting operation, or providing "a simple, ordinary opportunity" to commit a crime is *not* inducement. *See, e.g.*, *United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006); *Evans*, 924 F.2d at 717; *United States v. Perez-Leon*, 757 F.2d 866, 872 (7th Cir. 1985). *Pillado*, in which the Seventh Circuit confirmed that a typical sting operation does not constitute inducement even in the absence of predisposition, *see* 656 F.3d at 764, certainly does not stand for the proposition that Barta advances. *Pillado*'s clarification that "extraordinary inducements" are not required to entitle a defendant to an instruction on entrapment does not overrule, or call into question, the principle that ordinary stings are not "inducements" because a law-abiding citizen can be coaxed into crime "*only by* grave threats, by fraud, or . . . extraordinary promises." *Evans*, 924 F.2d at 717 (emphasis added). It is true that most of those cases do not address a total absence of predisposition; instead, they assume that the two elements inform each other. But in *Pillado,* as in this case, the government did not contend that one of the defendants was predisposed to commit any crime, yet the court went on to review the evidence of inducement in order to determine whether there were facts sufficient to constitute inducement. *Id.* at 766-67. That exercise would have been wholly unnecessary if Barta's characterization of the law of entrapment in this circuit were correct.

At bottom, the purpose of the entrapment defense "is to ensure that people who are not predisposed to commit a crime are not transformed into criminals by the government." *Pillado,* 656 F.3d at 765. The government did not contend that Barta was predisposed, so the relevant inquiry here is whether the government bears responsibility for transforming Barta into a criminal. Inducement is a species of causation. *Evans*, 924 F.2d at 717. Whether characterized as

"extraordinary" or otherwise, the inducement necessary for entrapment must have been such that "it tempted the person to commit a crime that he would not otherwise have committed." *United States v. Manzella*, 791 F.2d 1263, 1269 (7th Cir. 1986).

For someone already predisposed to commit the crime, the inducement necessary to establish entrapment must be sufficiently tempting to warrant a finding that the defendant committed the crime because of the government's actions rather than his own proclivities; predisposition makes it more likely that the person ultimately would have committed the crime absent any activity by the government all, so greater government-supplied temptation must be shown to establish that responsibility for the crime should be placed at the government's doorstep rather than the defendant's. By contrast, where (as here, by virtue of the government's waiver) there is no claim of predisposition, the inducement needn't be so great, but that is not to say, as Barta does, that it can be anything at all. The government's conduct must still be sufficient to "tempt[] the person to commit a crime that he would not otherwise have committed," *id.*, that is to say strong enough to overcome the scruples of an ordinary law-abiding (*i.e.*, non-predisposed) citizen. *Evans,* 924 F.2d at 717.

That is usually a question for a jury. *Mathews*, 485 U.S. at 63; *Plowman,* 700 F.3d at 1057; *Pillado*, 656 F.3d at 763. Here, the jury unanimously concluded, beyond a reasonable doubt, that the government did not persuade or influence Barta to join the conspiracy; the inquiry for the Court, then, is whether each of those jurors was irrational in coming to that conclusion. *United States v. Bek*, 493 F.3d 790, 800 (7th Cir. 2007). This is a high hurdle. *See United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir. 1995) (the court must "view the evidence in the light most favorable to the government" and the defendant bears the "heavy burden" of demonstrating that no rational trier of fact could have rejected the defense of entrapment):

> Generally . . . the question of entrapment is one for the jury, rather
> than for the court. Although Fed. R. Crim. P. 29 permits a court to
> direct a verdict of acquittal where there is "no evidence" from
> which a jury could find guilt beyond a reasonable doubt, in cases
> where there is at least some evidence in the record, it is for the jury
> to decide questions of fact, to weigh conflicting testimony, to draw
> reasonable inferences from the evidence and to make credibility
> determinations. . . . This is especially true in the entrapment
> context, for whether entrapment occurred is a factual issue; the
> defense is intertwined with the issue of intent and is often based on
> credibility determinations, which are traditionally reserved for jury
> resolution.

*Id.*

Barta fails to clear this hurdle. Barta primarily maintains that he was subjected to a "relentless pursuit" despite his lack of responsiveness to the government's overtures. As alternate, or additional, theories of inducement, he further contends that the government (1) preyed on Barta's sympathy for Buenrostro; (2) chose Sav-Rx as the "subject" of the bribe; and (3) altered the terms of the deal to assuage Barta's concerns further entice him.

Barta's primary argument fails because the jury was not compelled to view the government's sting operation as a "relentless pursuit." Barta primarily asserts that he was "pursued" because it was the government agents who first suggested to Medrano and Buenrostro that a "decision maker" from Sav-Rx needed to meet with George Castro, and thereafter stopped at nothing to get at Barta. But it was Medrano who contacted DiFoggio and inquired about whether Castro would be interested in doing corrupt business with Sav-Rx. From that proposition, it followed naturally that someone from the company would be involved in the scheme, and the government's reference to the involvement of an unnamed and unknown decisionmaker from the company could reasonably have been viewed as nothing more than a

natural step in responding to the corrupt initiative.[6] And under a permissible view of the evidence, Medrano and Buenrostro knew who at the company to involve in their corrupt proposal and did whatever they could to bring Barta to the table so that the corrupt deal would not be jeopardized. Similarly, Barta contends that it was the agents who "demanded" some kind of "proposal," or "paperwork," from the company, but it was Buenrostro and Medrano who solicited Barta to provide the proposal; DiFoggio, the government informant, continued to press Buenrostro and Medrano—not Barta— for the "paperwork" he could give to Castro. Indeed, the first three pages of Barta's argument regarding the government's "relentless pursuit" of him consist exclusively of contacts that the agents had with Medrano and Buenrostro; even if they pertained to him, these contacts do not show any *government* inducement *of Barta*. The demands for a proposal and the suggestion of a "gift" for Castro were not made *to Barta* by the government. Nor did the government do anything to convince Barta to attend the March 21 meeting, his first. That was accomplished by Buenrostro.

Up until the March 21 meeting, therefore, Barta cannot show any attempts by the government to persuade or otherwise induce *him* to commit a crime—a fact that effectively dooms Barta's entrapment claim. Buenrostro and Medrano may have prevailed upon Barta to participate, but there is no defense of private, or vicarious, entrapment in this Circuit, *Hollingsworth*, 27 F.3d at 1204, and while the Court of Appeals has recognized the conceptual

---

[6] The government points out that in his briefs, Barta portrays himself inconsistently as both the Sav-Rx "decision maker" and as a retired executive who "was no longer running [Sav-Rx] and had not done so for at least five years." Govt. Mem., Dkt. # 170 at 40 n.6. The same sort of inconsistency played out before the jury. *Compare*, *e.g.*, 3/21/12 Meeting Tr. at 6 ("I have a full, full line prescription management business") and 13 ("I have a mail-order pharmacy") *with* Piti Testimony, 6/12/13 PM Tr. at 14 ("I [Piti] manage and run Sav-Rx prescription services"), 20 ("I [Piti] run the day-to-day business and make the decisions"); Closing Argument, 6/14/13 PM Tr. at 39 "The daughter runs Sav-Rx. She has run it for six years. They're not even talking to the person who runs the business in the world of make believe"). This incongruity alone provided an adequate basis for the jury to reject the legitimacy of Mr. Barta's defenses.

validity of a derivative entrapment defense, *id.*, that defense requires that those who allegedly entrap the defendant derivatively must themselves have been entrapped.[7] Here, neither Medrano nor Buenrostro asserted an entrapment defense and there is, accordingly, no basis on which Barta may claim that he was entrapped by virtue of whatever importuning they directed to him.

Barta suggests that after the March 21 meeting, the government was obligated to "wait[] to see if Barta would respond," but the jury could reasonably have concluded on the basis of the recorded conversation at that meeting that Barta had agreed to join the conspiracy then and there, if not before. Barta had agreed to meet Castro to discuss the corrupt proposal and when he showed up at the meeting he readily acknowledged that he would be willing to pay a bribe (or so the jury could reasonably conclude); responding to Castro's explanation that the deal would involve a "finder's fee" for both Castro and the county official that was "just the cost of doing business," Barta, unfazed, told Castro that "I'd expect that." Barta confirmed that he understood that there would have to be a "good faith" payment up front, and that the deal Castro outlined— securing contract approval in exchange for the good faith down payment and a backend percentage of Sav-Rx's take, pegged to the size of the contract ultimately procured—"sounds good." From this evidence, the jury was entitled to conclude that Barta had already joined the initial agreement between Medrano and Buenrostro to try to secure a contract for Sav-Rx by bribing an official of Los Angeles County, making the issue of further "inducement" by the government irrelevant. *See United States v. Villegas*, 655 F.3d 662, 674 (7th Cir. 2011) (evidence

---

[7] "Private" entrapment suggests a claim predicated on the actions of a private individual, rather than a government agent, and as such "is just another term for criminal solicitation" and does not normally provide a defense to criminal conduct unless it rises to the level of coercion or duress. *Manzella*, 791 F.2d at 1269. "Vicarious entrapment" describes a situation in which an unwitting, but entrapped, individual "takes it upon himself to induce another person to participate in the crime." *United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir. 1988). "Derivative entrapment" occurs "when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment." *Hollingsworth*, 27 F.3d at 1204; *Pilarinos*, 864 F.2d at 256.

of "a willingness to discuss criminal activity" was "relevant to rebutting the level of inducement claimed by [defendant]"); *United States v. Orr*, 622 F.3d 864, 868-69 (7th Cir. 2010) (no evidence that defendant was retreating from criminal intentions); *United States v. Jones*, 950 F.2d 1309, 1314-15 (7th Cir. 1991) (rejecting entrapment defense where "[a] reasonable jury could conclude from this evidence that [the defendant] willingly chose to become involved in the conspiracy *before* he met . . . the government agent.").

As the further course of communications over the next several months reflected, there were still many details to be ironed out to determine whether a deal could actually be put together, but "it is the terms of the agreement rather than the details of implementation that determine [a conspiracy's] boundaries." *United States v. Schiro*, 679 F.3d 521, 525 (7th Cir. 2012). Unresolved issues about the structure and details of the proposed contract, or whether the county official would find the proposal feasible, were not essential aspects of the conspiratorial agreement, because a conspiracy is not conditioned on success. The touchstone of conspiracy liability is an agreement to participate in an endeavor which, *if completed*, would constitute a violation of the substantive statute. *Salinas*, 522 U.S. at 65 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."); *United Food & Commercial Workers Unions and Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013).

Accordingly, the fact that questions about the structure and viability of the proposed contract had not been resolved by the conclusion of the March 21 meeting did not preclude the jury from finding that Barta had, by that time, joined the conspiracy to secure a contract for some sort of pharmaceutical services with Los Angeles County through bribery—and that is the

conspiracy charged. *See* Indictment ¶ 2 (charging that the defendants conspired to pay a bribe to influence an agent of Los Angeles County in connection with "a contract for Sav-Rx to provide pharmaceutical services to Los Angeles County"). The meetings and communications to assess those questions, the jury could have reasonably concluded, were not preliminary to an agreement but were rather overt acts in furtherance of the agreement. *See, e.g.*, *United States v. Praddy*, ---F.3d----, 2013 WL 3884712, *3 (2d Cir. July 30, 2013) ("The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan."); *United States v. Guevara*, 706 F.3d 38, 43-45 (1st Cir. 2013) (rejecting defendant's argument that jury should have been instructed that preliminary negotiations were not sufficient to establish a conspiracy where district court instructed jury that "a conspiracy does not have to be a formal agreement or plan in which everybody involved sat down together and worked out all the details but the government must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime"); *United States. v. Crippen*, 627 F.3d 1056, 1065 (8th Cir. 2010) ("A discussion of how to achieve the purpose of an agreement constitutes an overt act in furtherance of the agreement . . . , and more specifically, telephone conversations 'in which plans and arrangements are made in furtherance of the conspiracy are overt acts.'"). The government argued at trial that Barta's questions sprang not from a reluctance to join the conspiracy, but from his interest in ensuring that the contract would be profitable, and that was not an irrational view of the evidence for the jury to take.

In any event, as evidence that the government refused to leave him alone after March 21, Barta again relies on DiFoggio and Castro's interactions with Medrano and Buenrostro, trying to set up another meeting where Castro could collect cash. Barta materialized for another meeting in Chicago on May 9, 2012, and the course of that lengthy meeting provided still further

evidence for the jury to conclude that Barta was fully on board with the conspiratorial agreement to secure a contract with Los Angeles County through bribery. Much of the meeting involved discussions of identifying the service and structure that would be most attractive to the county, and began with Medrano's presentation of a proposal he and Buenrostro were suggesting to use a minority owned business they would form as a front between the county and Sav-Rx. Barta confirmed that he didn't "have any problem with that" and that the proposal was "a very, real good idea." Discussing the contours of a potential contract with the county, Barta volunteered to "get you a copy of the RFP we did here [in Cook County]" and confirmed again that he understood that the official needed his good faith payment to set the deal in motion.

Nothing that occurred during this meeting compelled the jury to draw any inference that the government was attempting to persuade or manipulate Barta into participating in the deal. To the contrary, responding to Barta's observations that the first thing the group needed to do was to determine whether the county had a problem with its prescription drug services, Castro agreed that "if it's something [the official's] not gonna be able to sell to the Board of Supervisors, [the official's] not gonna waste his time." And, again confirming that the details of the potential contract were not a stumbling block, Barta advised: "I'm happy to do any, any way he wants to put it together."

After the May 9 meeting, Barta argues, the government "relentlessly chased" Barta for the next six weeks, "in the face of his total lack of responsiveness." Barta points to Castro's attempts "to engage Barta in no less than nine unreturned emails and telephone messages." However, he fails to recognize that during this time, his co-defendants were repeatedly assuring DiFoggio and Medrano that Barta was "on board" and ready to move forward with the corrupt deal. The agents were not working in a vacuum; they were conducting an operation in which

they were repeatedly being told that Barta was ready to deal. That context makes Castro's "unsolicited" emails—none of which was directed solely at Barta—substantially less sinister than Barta intones. Barta ignores these facts, but the jury was entitled to credit the statements that Medrano and Buenrostro were making about Barta's commitment to the endeavor, particularly when Barta confirmed as much when Castro got him on the phone, alone, on June 12, telling Castro that they were "probably ready to move" on the deal. Barta argues that he was confused about who Castro was during this call, but of course the jury was entitled to believe otherwise.

Even if one credits Barta's argument that he didn't agree to anything until the final June meeting in Omaha, the jury could not be characterized as irrational for concluding that he ultimately agreed to join the conspiracy not because the government's "relentless pursuit" had worn him down, but because the contours of the deal had been worked out to his satisfaction. And the multitude of communications is not inherently problematic where, as the defendants themselves have suggested in arguing that they never believed that it was possible to obtain a contract, securing a publicly bid government contract through bribery is a complicated undertaking. That the government communicated regularly with those who appeared to be the participants in the prospective deal and tried to drive the discussions to completion does not, as a matter of law, constitute inducement. *United States v. Higham*, 98 F.3d 285, 290 (7th Cir. 1996) ("persistence . . . in the absence of coercion . . . does not establish inducement"); *United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995) (("persistence 'is not alone sufficient to carry the case beyond an ordinary opportunity.'")(quoting *United States v. Santiago-Godinez*, 12 F.3d 722, 729 (7th Cir. 1993)).

The Seventh Circuit's recent opinion in *Plowman* illustrates the point. There, a government agent orchestrated a five-month sting operation targeting a local politician with

substantial authority and influence over zoning matters. Posing as a strip club owner who wanted to open an establishment in Indianapolis, the agent persisted in his efforts to steer the proposed transaction to properties that would require a zoning variance (and thus, the defendant's influence) even when the defendant repeatedly advised him to select a property that required no such variance.[8] 700 F.3d at 1058-59. The Court held that, "at most," the agent was persistent and that persistence over the course of a five-month sting operation, involving at least a dozen meetings and direct communications between the agent and defendant, did not create even a jury question as to inducement. *Id*. Castro's contacts with Barta, by contrast, lasted only three months and involved only three meetings and one direct phone conversation, and plainly involved less substantial government "persistence" than occurred in *Plowman*. *See also, e.g.*, *Theodosopoulos*, 48 F.3d at 1447 (no inducement where government interaction with defendant occurred over the course of three months and nine meetings).

In sum, then, for all of the government contacts that Barta cites at great length, very few were directed at Barta, and even fewer at him alone. In the meantime, two other individuals who purported to speak for him—and whose tape-recorded statements the jury was entitled to credit—repeatedly represented that Barta was interested in the corrupt deal, and they were able to secure his presence at two Chicago meetings where the arrangement was discussed. They were also able to arrange a meeting in Omaha at which he appeared with a check for Castro. The government had only to prove that *its agents* did not "persuade or otherwise induce" Barta; it was not on the hook to prove beyond a reasonable doubt that he was not persuaded by others to join to the deal. And the jury was not required to conclude that Barta yielded because he was being badgered; this Court cannot conclude as a matter of law that the small handful of

---

[8] This was the defendant's view of the evidence, which the Court credited for purposes of its discussion.

interactions between Barta and the government would have worn down the resistance of an otherwise innocent person. And as noted, the jury could have concluded that Barta had joined the essential conspiratorial agreement even before he showed up in Chicago in March 2012 and confirmed his willingness to pay a bribe to secure a contract.

Barta's other inducement arguments can be quickly dispatched. First, the argument that the government took advantage of Barta's sympathy for Buenrostro is not supported by evidence. There is not a single example of a government agent encouraging Barta to help out "Gus." Barta points to two of his own statements—that he'd "like to see Gus do something" and that "Gus asked me to come and tell [Castro] what we do"—but these do nothing to suggest that *the government* lured Barta in with a promise to help Buenrostro. Likewise, Buenrostro's statements that Barta wanted to help him get on his feet or told him he was doing him a favor have nothing to do with whether *the government* persuaded Barta to join the deal. As far as the record shows, no one made any "pleas based on need, sympathy, or friendship" to Barta, in contrast to what occurred in cases he cites. *See United States v. Theagene*, 565 F.3d 911, 922 (5th Cir. 2009) (inducement by cooperating witness "in light of the relationship between [purported bribe recipient] and [defendant] as government agent and delinquent taxpayer"); *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985) (undercover informant "engaged [defendant's] cooperation with a tale of financial woes, the need to support a new spouse, and terminal cancer, all the while knowing that [defendant's] sister recently had died of cancer"); *see also United States v. Blassingame,* 197 F.3d 271, 283 (7th Cir. 1999) (rejecting argument that defendant was induced by government's exploitation of his friendship with another coconspirator). If Buenrostro asked Barta for a favor, that is not part of the evidence in this case, and Buenrostro is not a government agent, in any event. If Barta personally was motivated to commit a crime for

the purpose of helping Gus—as opposed to simply helping him of his own accord—he is neither less liable nor more entrapped for his altruism. *United States v. Spano*, 421 F.3d 599, 602-03 (7th Cir. 2005) ("a conspirator doesn't have to benefit personally to be guilty of conspiracy").

Next Barta says that inducement is shown because the government chose Sav-Rx's mail order business as the "subject" of the bribe that would be paid to the purported Los Angeles County official. That is a questionable assertion, at best, and in any event one with which the jury could reasonably disagree; it was Medrano, in his first calls to DiFoggio, who first described the opportunity to DiFoggio as "basically . . . a prescription drug program . . . it's basically you get your prescriptions through the, through the mail" and pointed to its contract with Cook County, which involved mail-order prescription services. And even assuming for the sake of argument that the government identified the mail order business as the subject of the proposed contract, Barta does not explain why that fact would amount to inducement as a matter of law; whether the mail order service, or some other, was to be the subject of the proposed contract with Los Angeles County says nothing at all about whether the government entrapped Barta. Any sting operation involves presenting the opportunity to commit a crime; it is no defense to argue that you would have preferred to commit the crime in another manner.

Finally, Barta argues that he was induced because the government altered the terms of the deal to assuage his concerns or overcome his reluctance to participate. For example, Barta asserts that when he alerted the agents to the "(true) fact that the (real) Los Angeles County hospital system had installed robots in its pharmacies . . . , the government manufactured lies concerning supposed 'service interruptions' and other 'inefficiencies' with those robots." The government likewise fabricated details such as hospital overcrowding, a ten-day waiting period for prescriptions, and a problem with patients receiving the wrong medication. The government also

inflated the potential profit margin for the prescription drugs and twice increased its estimate for the number of prescriptions, rising from one to three million.

Barta contends that by changing the deal to entice him, the government went beyond presenting him the opportunity to pay a bribe and improperly induced him. However, Barta's argument fails because, as discussed above, the jury was entitled to believe that Barta was on board from the very beginning of his involvement. It is a permissible view of the evidence that Barta acceded to the basic concept of obtaining a government contract through bribery on March 21; under that view, any subsequent details the government invented were not inducements at all. Moreover, the purported details about the Los Angeles County system's "need" for SavRx came in response to *Barta*'s questions and apparent concern with making a contract with SavRx look legitimate and not suspicious; absent his participation, the government would have had no occasion to supply such information (and the evidence suggests that "Castro" was not prepared to provide it). The other details that Barta claims were changed to entice him did not convert the deal into an "extraordinary promise," *see Evans*, 924 F.2d at 717, such that they would lure an innocent into committing a crime. As an extremely successful and wealthy businessman at the end of his career, and one who now maintains that he was no longer involved in running Sav-Rx, Barta did not have any financial or professional incentive to obtain another contract. He makes no compelling argument that bumping up the purported number of prescriptions available from one to three million, or increasing the profit margin per prescription, would make the corrupt deal too good for a law-abiding citizen to pass up. *Cf. United States v. Hall,* 608 F.3d 340, 344 (7th Cir. 2010) (that large profits would be derived from transactions conducted at normal market rates does not mean government offered extraordinary inducement). Barta, moreover, made clear throughout that he did not need money; he would be hard-pressed now to contend

that promises of profitability were such compelling inducements that he abandoned his law-abidingness.

The jury's verdict must be seen as reflecting its conclusion that in its dealings with defendant Barta the government did not use "tactics calculated to overcome the reluctance of a law-abiding citizen—a citizen who is not predisposed, not inordinately willing, not poised and ready (the exact formulation does not matter), to engage in criminal activity." *Evans*, 924 F.2d at 717. Although his able counsel have offered a vigorous argument to the contrary, it cannot be said that the jury's unanimous view was irrational. Barta is therefore not entitled to a judgment of acquittal based upon a failure to rebut the entrapment defense.

## II.     New Trial Motions

Defendant Medrano requests a new trial, contending that the court erred when it: (1) admitted evidence of the Dermafill sale; (2) admitted hearsay statements made by individuals other than Medrano at a meeting related to Dermafill; (3) denied Medrano's motion to bar Agent Casanova's opinion testimony; and (4) admitted through FBI agents the recorded statements of cooperating witness Michael DiFoggio, who did not testify.

This Court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006).

### A.     Dermafill Evidence

Before trial, the Court granted the government's vigorously opposed motion *in limine* to admit the Dermafill evidence under Federal Rule of Evidence 404(b). *See* Dkt. ## 74-II, 98, 108; 5/10/13 Tr. at 5-10; 5/29/13 Tr. at 2-4.  At trial the jury heard evidence that Medrano and other

individuals arranged and profited from a corrupt deal to sell Dermafill bandages to the Los Angeles County hospital system in a deal brokered by George Castro, whom Medrano's acquaintance Michael DiFoggio introduced to Medrano. The evidence included a recording of a meeting at which DiFoggio, Castro, Medrano, and two other individuals discussed the deal, although Medrano himself did not make many statements.

According to Medrano, this evidence was admitted for the improper purpose—or at least had the effect—of suggesting that in the charged conspiracy he acted in conformance with a propensity shown by his prior acts. Medrano maintains that the Dermafill matter, which is the subject of a separate indictment, "was not substantially related to the facts of this case."

Rule 404(b) permits the use of evidence of prior bad acts for a variety of purposes, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *United States v. Chapman*, 692 F.3d 822, 827 (7th Cir. 2012). Evidence of prior bad acts may be admitted when: it "(i) is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (ii) shows that the other act is similar enough and close enough in time to be relevant; (iii) is sufficient to support a finding that the defendant committed the other act; and (iv) has probative value not outweighed by the danger of unfair prejudice." *Id.* (quoting *United States v. Green*, 258 F.3d 683, 694 (7th Cir. 2001)).

Medrano has not persuaded the Court that it erred in admitting the Dermafill evidence under Rule 404(b) or that doing so caused Medrano undue prejudice. All the required criteria were met here. First, the evidence had a permissible purpose. The evidence was probative of Medrano's knowledge and intent, particularly insofar as it suggests his knowledge that George Castro purported to be both willing and able to facilitate dealings with Los Angeles County through the payment of bribes. It further suggests that in the Sav-Rx matter, Medrano did not

believe the defendants to be engaged in a legitimate business deal brokered by Castro. Second, the Dermafill and Sav-Rx deals were sufficiently similar and close in time (indeed, one fed right into the next). In particular, Medrano dealt with DiFoggio and Castro in both deals, which both involved Castro purporting to broker a purchase of medical goods or services by Los Angeles County in exchange for a "commission" shared with a county official.  Third, there was sufficient evidence from which the jury could have concluded that it was "more likely than not" that Medrano participated in the corrupt Dermafill deal. Among other things, the evidence showed that Medrano asked DiFoggio to arrange the meeting between him, his Dermafill colleagues, and Castro, at which the deal was discussed in detail; and after the product was ordered, he was caught on tape paying DiFoggio his cut in cash.

Fourth, the probative value of the evidence was not substantially outweighed by the prejudicial effect on Medrano. Medrano does not explain how the evidence unfairly prejudiced him—other than being probative of his guilt. *See United States v. Coleman*, 179 F.3d 1056, 1062 (7th Cir. 1999) 9(noting that "*all* probative evidence is prejudicial to the party against whom it is introduced") (emphasis added)). "Unfair" prejudice results when it causes the factfinder to declare guilt "on a ground different from proof specific to the offense charged." *Id.* (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). But Medrano cannot easily make the case that the jury found him guilty based on some propensity suggested by his participation in the Dermafill scheme. Without considering the Dermafill evidence against Barta and Buenrostro, the jury nevertheless found them both guilty. Medrano is hard-pressed to argue that undue prejudice from the Dermafill evidence is what caused his conviction, particularly where there was a large body of evidence pertaining exclusively to his role in the Sav-Rx matter. *See id*. at 1062 ("the

evidence in question was a drop in the fairly large bucket of evidence of Carver's involvement in drug trafficking").

Medrano's hearsay argument also fails. He contends that the jury should not have heard statements[9] made by others during the recorded Dermafill meeting. But as the Court ruled prior to trial, the statements were not hearsay—and therefore were not excludable under Rule 802—because they were not admitted for their truth, *see* Fed. R. Evid. 801(c)(2). Medrano fails to engage with this determination in his motion, and therefore has given no reason for the court to overturn its evidentiary ruling.

### B.    Opinion Testimony

Medrano, on behalf of all defendants, further argues that the Court improperly allowed Special Agent Casanova (*a.k.a.* George Castro) to offer opinion testimony regarding his understanding of certain live, telephone, and email conversations published to the jury. At trial, the government asked Casanova both what he meant when he said certain phrases, and what he understood the defendants to mean when they used certain words or phrases (for example, the "guy," or the "retainer") in conversations. The defendants' timely objections to the testimony were overruled, and they contend that this error entitles them to a new trial. In particular they argue that the recorded conversations were in "plain English" and that jurors required no assistance in understanding them.

The testimony was proper lay opinion testimony. Fed. R. Civ. P. 701. Such testimony is permissible if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on

---

[9] Medrano does not specifically identify any problematic statements, so presumably he contends that the entirety of the recorded conversation consisted of out-of-court "assertions" offered for their truth. *See* Fed. R. Evid. 801(a),(c).

scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.*; *United States v. Gaytan*, 649 F.3d 573, 581-582 (7th Cir. 2011). A law-enforcement officer's testimony is a lay opinion if it is limited to what he observed or to other facts derived exclusively from the particular investigation he is testifying about. *Gaytan,* 649 F.3d at 582 (citing *United States v. Oriedo,* 498 F.3d 593, 603 (7th Cir. 2007)).

Here, the first and third requirements of Rule 701 clearly are met. Casanova testified only about his own understanding of the conversations; such testimony was based only on his own personal knowledge as a participant. Furthermore, as the defendants appear to agree, Casanova was not testifying based upon any specialized knowledge (such as "code words" used in drug deals); he was simply describing his own beliefs and understandings.[10] *See United States v. Rollins*, 544 F.3d 820, 832-833 (7th Cir. 2008) (officer's testimony about his "impressions" proper).

Finally, Casanova's opinions were helpful in understanding his testimony. The evidence of what Casanova understood was probative of what the defendants meant, although "based entirely on [his] mental processes rather than [theirs]." *See United States v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012). It was not conclusive: it was for the jurors to assess, based on what they heard (or read, in the case of emails), and upon all other evidence whether Casanova's understanding was reasonable or correct. But there is nothing inherently problematic about a witness testifying about what another person was thinking, provided that the testimony is based on the witness's own perception. *Id.* (collecting cases). And the statements were not hearsay. *See United States v. Phillips*, ---F.3d----, 2013 WL 4803210, at *4 (7th Cir. Sep. 4, 2013) (*en banc*)

---

[10] Casanova did not offer expert testimony on any topic, so there was no danger at trial of the jury being confused by "dual testimony." *See United States v. York*, 572 F.3d 415, 423-27 (7th Cir. 2009).

(("It is not hearsay to testify to what someone told you and what you thought the person meant, as long as you're not insisting on 'the truth of the matter asserted in the [out-of-court] statement.'") (quoting Fed. R. Evid. 801(c)(2))). Moreover, defense counsel cross-examined Casanova vigorously about his beliefs regarding things he heard from the defendants,[11] and the jury was instructed throughout the trial that only the recordings and emails—not even the transcripts—were evidence of what was actually said; there was no risk of Casanova's testimony being viewed as something other than his own perception of events.

### C.    Confidential Witness Statements

Finally, Medrano on behalf of all the defendants argues that it was prejudicial error for the Court to admit statements made by DiFoggio although he did not testify. Again, the details of the argument are sparse, but Medrano states that it was error for the court to "allow[] the government to use an FBI agent to authenticate and admit the recordings as evidence." The Court notes as an initial matter that the Government moved *in limin*e to establish the authenticity of the DiFoggio tapes by means of agent testimony and none of the defendants objected. *See* Barta Resp. to Government's Consolidated Motions In Limine, Dkt. 97 at 12; 1/31/13 Pretrial Conf.

---

[11] It is also worth noting that defense counsel also tried to elicit Casanova's opinions about what he and other people meant in recorded conversations that they, rather than the government, introduced. For example, Barta's attorney played a telephone call of June 8, 2012, at 5:06 p.m. and asked Casanova a number of questions about what he understood defendant Buenrostro to be telling him. *See* 6/10/13 AM Tr. at 59-60. "Q. Mr. Buenrostro tells you, the issue there is his, his daughter who runs the pharmaceutical side went with him, meaning went with him on vacation, right? A. It says went with him, so I don't know where. Q. All right. But you understood him to say the pharmaceutical side of the Barta family is Sav-Rx isn't that correct? That was your understanding? A. The statement he is making is his daughter runs the pharmaceutical side. Q. And did you understand the pharmaceutical side to be Sav-Rx? A. Not necessarily, no. Not at that point. Q. All right. Did you think there was a different pharmaceutical company they had than Sav-Rx?A. No, Sav-Rx had a couple different type of companies or functions or services, so I didn't know exactly which was which. Q. So on this occasion, you did not understand Mr. Buenrostro to be telling you that Mr. Barta doesn't even run Sav-Rx anymore, his daughter does? A. No, I did not understand that."

Tr. at 22 ("am I right to understand there is no objection to the tapes on authenticity grounds?"—all defendants responding affirmatively). The defendants therefore waived this objection. The Government, however, has "waived the waiver" by failing to invoke it in its response to the post-trial motions, *see Hollingsworth*, 27 F.3d at 1203, so the Court will consider the substance of the defendants' argument.

The Court takes Medrano's argument to be a challenge to foundation. Under Federal Rule of Evidence 901(a), before evidence can be admitted, the proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." For audio recordings, this can be done in two ways: "(1) a chain of custody demonstrating the tapes are in the same condition as when they were recorded, or (2) testimony demonstrating the accuracy and trustworthiness of the tapes." *United States v. Collins*, 715 F.3d 1032, 1035 (7th Cir. 2013). Here, the government primarily used the FBI case agent, Brian Etchell, to testify as to the process or system through which the recordings were created and verify that the digital recordings were what they purported to be. *See* Fed. R. Evid. 901(b)(1), (b)(9). Medrano does not suggest, let alone explain why, the recordings were not accurate or trustworthy. Moreover, he does not explain what was deficient about the government's method of authenticating the recordings at trial. His challenge to foundation fails.

Alternatively, if Medrano intends to raise an issue under the Confrontation Clause, based on DiFoggio's absence at trial, he does not get out of the gate. Without the declarant's presence at trial, the Confrontation Clause of the Sixth Amendment bars the admission of testimonial statements that are admitted for the truth of the matters asserted, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him. *United States v. Wright*, 722 F.3d 1064, 1067 (7th Cir. 2013). Here, as the Court's instruction to the jury made

clear, DiFoggio was not a witness against the defendants; rather, his statements provided context for their own statements and actions. This is a permissible use of the evidence. *See id.* (collecting cases on "context"). Much of the conversation captured on certain recordings would have been senseless without hearing DiFoggio's words. Moreover, the jury was specifically instructed as follows: "You have heard evidence in the form of recorded conversations between the defendants and a confidential witness Michael DiFoggio. Michael DiFoggio did not appear as a witness in this case. Anything Michael DiFoggio said during those recorded conversations should only be used to provide context for what the defendants said. Michael DiFoggio's statements may not be relied on by you to establish the truth of anything he said." The Seventh Circuit has approved the use of a jury instruction similar to the one given by the Court to avert possible prejudice. *See id.* at 1068. Accordingly, Medrano has not established that the Court's ruling violated his rights under the Confrontation Clause.

## III.    Motion to Contact Jurors

Defendant Barta, joined by his codefendants, has also moved for leave to contact members of the jury in this case in order to investigate whether jurors engaged in deliberations before the presentation of evidence and arguments had been completed. The factual predicates for their suspicion of premature deliberations are first, a note signed by the juror who ultimately became the foreman of the jury, asking for the Court to repeat the preliminary instruction that had been provided to the jury before the trial began on the elements of the crime charged, and second, the speed with which the jury reached its verdict. For reasons set forth more fully below, these facts do not warrant an inference that the jury deliberated prematurely. And even if the wisp of such an inference could be teased from these facts, the Court would exercise its discretion not to permit contact with members of the jury to investigate that possibility. As the

Supreme Court and the Seventh Circuit have repeatedly confirmed, post-verdict investigations into allegations of juror misconduct "are likely to do more harm than good." *United States v. Farmer*, 717 F.3d 559, 564 (7th Cir. 2013) (*citing, inter alia, Tanner v. United States*, 483 U.S. 107 (1987)).

### A.     The Juror Note

After the jury was selected and sworn, but before opening statements, the Court gave the jurors preliminary instructions that were drawn from the larger set of jury instructions that were to be given to the jury after closing arguments. Included in these preliminary instructions were instructions on the elements of the crimes of conspiracy and bribery, as well as instructions that the jurors should not discuss the case among themselves until the trial presentations had been completed and that the jurors should not make up their minds about the case until they had the opportunity to deliberate collectively. There were no objections to the Court's preliminary instructions.

The note Barta invokes in support of his motion was given to the Court on June 7. That was the fourth day of the trial, but the presentation of evidence did not begin until approximately noon on June 4, and the note was delivered by the Courtroom Security Officer ("CSO") before the trial resumed on June 7. Thus, there had been approximately 2.5 days of testimony when the note was delivered to the Court. At that point, the Government had completed its direct examination of FBI Special Agent Gabriel Casanova, and cross-examination was about to begin.

The signed and dated note (see Dkt. # 147) stated:

> Could the Judge Refresh the Jury's Direction on the "Crime" defined in the indightment that we are tasked to make judgement around.?

Upon receipt of this note, the Court read the note to the parties and their counsel. Defense counsel conferred and were not of a unanimous view as to how to respond to the note, debating whether the preliminary instructions should be read to the jury again in their entirety, whether just the instructions as to the elements of conspiracy and bribery should be read, or whether no instructions should be re-read. Ultimately, the Court concluded that none of the preliminary instructions would be re-read, and that the jury would simply be advised that they would be instructed again prior to their deliberations. None of the defendants requested that the Court instruct the jury not to deliberate prematurely in response to the note.

Mr. Barta argues that the text of the note suggests that the juror wrote the note on behalf of the entire jury, but review of the transcript indicates that was not how the Court understood the note at the time; when the Court spoke to the jury about the note, the jurors were advised that "I did want to acknowledge the receipt of a note from one of you requesting refreshing of . . . one of the instructions that was given preliminarily." Further, the fact that the note was identified as coming from a specific juror belies the notion that it was from the jury as a whole. That the note asks the Court to refresh "the jury's direction" does not suggest otherwise; the instructions were provided to the jury as a whole, not to individual jurors. It would have been odd for one juror to ask to be refreshed on "my direction" or "my responsibility."

In any event, whether the note reflects an individual's question, or one that was shared by some or all of the other jurors, there is no basis to infer from the question that the jurors were engaging in premature deliberations. The fair inference from the note is that the jurors were seeking to follow, not violate, the Court's instructions. The note simply requested that the Court repeat several instructions that they had already been given. The direct inference supported by the request is that the jurors wanted to accurately recall and understand the elements of the

crimes charged so that they could better follow the presentation of the evidence as it was presented. Indeed, that was the purpose of providing the jury with preliminary instructions and they were advised of that purpose: "hopefully, [the preliminary] instructions will help you put the evidence in context as you sit through the trial and understand the evidence a little better." The June 7 note indicates that the jurors were seeking to follow the instructions that they had been given, not that any juror was deciding the case prematurely, before all of the evidence had been presented.

In any event, in response to the note, the Court instructed the jurors that they would be instructed again "before you begin your deliberations." And the Court repeated its instruction not to deliberate before all of the evidence was in before virtually every break that was taken during the course of the trial. At the morning break on June 7, for example, and again before the lunch and afternoon breaks, the Court reminded the jurors "not to discuss the case among yourselves during the break." And at the end of that day, the Court reiterated in more detail its instructions not to deliberate prematurely:

> I want to make sure to remind you again at the end of this week, the trial is progressing but the trial is not over. As I told you at the outset, I expect the evidence to take up to a couple of weeks to present and you're not to begin your deliberations until all of the evidence in the case is in and you have a chance to go to that jury room collectively and start discussing the evidence. So until then, you should keep an open mind and not begin your own individual deliberations about the case.

Similar instructions were provided throughout the course of the trial. Under these circumstances, the Court believes that, even if the June 7 note suggested that some jurors had prematurely begun discussing the case (and, again, the Court does not find that to be a reasonable inference from the note), the repeated instructions and reminders to the jury not to deliberate prematurely and to "keep an open mind" belie an inference that the jurors had made up their

minds together before the actual jury deliberations ever began—particularly in the absence of any evidence that they ignored these repeated instructions.

### B.     The Speed of Deliberations

The defendants argue, however, that the jury's quick verdict *is* evidence that the jury disregarded these instructions. They maintain that a verdict in less than four hours, following a two-week,[12] multi-defendant bribery trial, "suggests that premature deliberations may have occurred or that some other extraneous or improper influence may have been at work." To the contrary, the most reasonable inference to be drawn from the jury's quick verdict is that the jurors found the evidence against the defendants to be quite strong and easy to understand. Perhaps for that reason, Barta's brief offers no precedent holding, or even suggesting, that brief deliberations support an inference that the jury deliberated prematurely or that "some other extraneous or improper influence" may have compromised the jury's work.

Further, as many courts have noted, the speed of a jury's deliberations may also reflect the inevitable fact that jurors tend to form preliminary opinions about evidence during the course of the trial. Over the course of a two-week trial, during which the most significant evidence was presented to the jury repeatedly, it would be surprising if individual jurors did *not* have a preliminary view of the strength or weakness of the evidence against the defendants when their deliberations began. To the extent that the motion appears to be founded on the premise that jurors improperly "deliberate" if they individually form preliminary opinions about the case that are not shared with the other jurors, it is simply off base. The Seventh Circuit has expressly recognized that "[i]t is virtually impossible for a human being serving as a juror not to form preliminary opinions about a case while the evidence is presented." *Farmer*, 717 F.3d at 565.

_____

[12] Evidence was presented on all or part of eight days.

That jurors may form preliminary opinions does not, however, mean that they have made up their minds before deliberations or that they have improperly communicated about the case with other jurors or others outside the jury. *See, e.g.*, *United States v. Oshatz*, 715 F. Supp. 74, 76 (S.D.N.Y. 1989) (juror's statement that jurors had made up their minds following testimony of prosecution's chief witness did not necessarily mean that the jurors had deliberated prematurely).

It is not surprising, then, that cases denying post-verdict relief where jury deliberations have been far briefer, and/or trials longer, than in this case are legion. *See, e.g.*, *United States v. Cunningham*, 108 F.3d 120, 123-24 (7th Cir. 1997) (reversing grant of Rule 29 motion based on jury's ten-minute deliberation following two-day jury trial, and holding that "before attaching great significance to the short time the jury took for deliberations, we must have reason to suspect that the jury in some way disregarded its instructions or otherwise failed in its duty"); *United States v. Hooker*, 198 Fed. Appx. 545, 547 (7th Cir. 1997) (rejecting appeal based on two-hour deliberation following four-day jury trial); *United States v. Penagaricano-Soler*, 911 F.2d 833, 846 (1st Cir. 1990) (rejecting appeal based on inadequacy of jury deliberations lasting four hours following five-week trial).

### C.     The Perils of Post-Verdict Jury Inquiries

The circumstances above do not make for a compelling case to permit defense counsel to contact jurors in order to investigate whether they performed their duties properly. Against the absence of a substantial justification for such an intrusion, the Court also considers the warnings of the Supreme Court and the Seventh Circuit that post-verdict inquiries of jurors are likely to do more harm than good. As summarized in *Farmer*, 717 F.3d at 564, while a permissive standard for allowing post-verdict investigations would likely result in the identification of some verdicts that were the product of improper influences on the jury, more often they would result in

unwarranted harassment of citizens who simply tried their best to perform an important civic duty that may have taken a substantial toll on them in the process. Adding the prospect of post-verdict inquiry about their own conduct to the burdens jurors must bear would likely chill the willingness of even the most civic-minded citizens to serve on juries, a development that would ultimately threaten the viability of the jury system as a whole.

Federal Rule of Evidence 606(b) reflects these concerns by imposing significant restrictions on the use of juror testimony to impeach a verdict. Those restrictions apply to testimony about internal deliberations and may not preclude the admission of juror testimony about communications that occurred during the course of the trial, but that limitation on the scope of the rule does not diminish the force of the premise, particularly where the concern relates to premature deliberations rather than extraneous influences. While the defendants' motion also offers the fleeting speculation that "some other extraneous or improper influence may have been at work," Motion, Dkt # 158 at 4, there is literally no basis in the record on which to indulge that speculation. What the defendants have presented here is a claim that the jurors deliberated prematurely. And as the D.C. Circuit observed in *United States v. Williams-Davis*, 90 F.3d 490, 505 (D.C. Cir. 1996):

> Preserving the finality of jury verdicts militates strongly in favor of barring post-trial juror assertions of pre-deliberation discussion. The probability of some adverse effect on the verdict is far less than for extraneous influences. When there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.

The defendants acknowledge that the decision to allow a party to contact jurors following trial is "within the discretion of the trial judge." *Delavaux v. Ford Motor Co.*, 764 F.2d 469, 471

(7th Cir. 1985); *see also Farmer,* 717 F.3d at 564 (district court's handling of allegations of premature deliberations is reviewed for abuse of discretion). In the Court's view, the defendants' concerns that the jury deliberated prematurely are grossly inadequate to warrant intrusion into the jury's province and pale in comparison to other cases in which courts have denied similar requests. *See, e.g.*, *United States v. Gigante*, 53 F. Supp. 2d 274, 277-78 (S.D.N.Y. 1999) (denying request to interview jurors even where a third party testified that "jurors had discussed the case in groups before and during deliberations and had been influenced by the views of an alternate"). Judge Weinstein's conclusion to his opinion in *Gigante* serves well in this case, too:

> The jury did its job well.[13] It should not be called to account now. Every juror cannot be expected to slavishly follow every judicial injunction over weeks or months of a trial. . . . Minor deficiencies—even if they exist . . .—could have had no appreciable influence during a trial which took so many days and was so effectively tried by excellent counsel on both sides.

Accordingly, the defendants' motion to contact jurors is denied.

* * *

For the reasons stated above, the Court denies each of the defendants' Rule 29 and post-trial motions.

Date: September 11, 2013

_____
John J. Tharp, Jr.
United States District Judge

---

[13] The Court notes in this regard that counsel for two of the defendants expressly commended the jurors during closing arguments for their attentiveness and focus during the trial. *See* 6/14/13 Morning Tr. 44 (Barta counsel: "I am impressed with your attentiveness"); 85-86 (Buenrostro counsel: "it's been evident to all of us on both sides of the courtroom that you have been a very conscientious jury, a very attentive jury, a very focused jury").